ROYAL PALM CEMETERY SYNDICATE, ROBERT B. LASSING, MANAGING TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102195. Promulgated September 17, 1941.

*Donald V. Hunter, Esq.*, for the petitioner.
*F. L. Van Haaften, Esq.*, for the respondent.

OPINION.

ARUNDELL: Two issues are here for decision, the first of which involves the classification of the petitioner for tax purposes. The respondent seeks to treat it as a corporation; the petitioner opposes this action. The issue has a dual aspect involving, first, the question of whether the petitioner was in existence at all during the taxable years and, second, if the first answer is affirmative, the nature of the business carried on by it.

Decision of the first issue must turn narrowly on the question of whether the business carried on by the petitioner during the taxable years was on behalf of Batson as an individual, the syndicate members as a loose group not yet being formed into a business enterprise, or for the syndicate itself. It seems apparent, as will be developed below, that the nature of the business, the method by which it was carried on during the taxable years, and the form of the syndicate agreement render the petitioner taxable as a corporation if the syndicate was in existence then as the real party in interest.

Resort must be had first to the documents executed by the parties in the forepart of 1936. These speak plainly of a joint adventure or syndicate "operating" in St. Petersburg, Florida. They provide for purchase by the syndicate of property and for its operation by a syndicate manager. The membership of the group and its liabilities became definitely fixed under the signed agreement of purchase. From the date of the execution of that instrument the operation of the cemetery became the petitioner's responsibility. The manager, who had functioned before as receiver, was retained. His employer, however, became the syndicate; his salary and duties were fixed by the syndicate agreement.

The full form and purpose of the syndicate was at the same time spelled out in an accompanying syndicate agreement. It provided for the immediate organization of the syndicate. It was examined and assented to by all the members. Certificates of ownership were printed and endorsed by all members at the beginning of the year 1936.

The facts so far are without inconsistency and point toward the conclusion that the syndicate was organized and functioning from the beginning of 1936. The petitioner, however, points to certain facts which do not entirely support this view. The title to the beneficial interest remained in Batson. This circumstance is, however, a matter

without significance. Purchases of importance are largely made by a method similar to that provided here and do not prevent possession and management, as here, from passing to the purchaser. The petitioner points to the fact that Batson supervised operations during the taxable year, received all reports, and made all important decisions with reference to the cemetery. It remains, however, that the single objective of these operations was to pay off the debt owed to Batson in accordance with the terms of the purchase. His only benefit, as seller, from the operations was to receive his price more quickly. The profits were not his except as they applied on the price. Moreover, Batson occupied a dual role of purchaser and seller and it is as reasonable to assume that his efforts were exerted on behalf of the syndicate as that they were for himself.

It is pointed out that the syndicate certificates were not issued until 1939 and there is testimony, consistent therewith, that the parties intended the syndicate to come into existence only after the price had been paid. We think, however, that the intent of the parties is better to be collected from the syndicate agreement, which, though itself unsigned, was given written approval by the parties, and from the contract of purchase and the preparation of stock certificates. From these it seems apparent that immediate organization of the syndicate was contemplated. The action following thereon being most consistent with this view, it must be concluded that the syndicate was in existence during the taxable years.

The form of organization before us provides for a central management, a continuation of existence beyond the lives of the original members, transferability of interests with certain restrictions, and the holding of title by the syndicate as an entity. It is repeatedly stated that the syndicate is to function "as an entity." It is to be controlled by the vote of its members. Distribution of profits is to be by way of "dividend." Formal certificates of ownership were provided.

In these circumstances the petitioner must be held to fit within the long established definition of an association taxable as a corporation. *Morrissey* v. *Commissioner*, 296 U. S. 344; *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369; *Kettleman Hills Royalty Syndicate No. 1* v. *Commissioner*, 116 Fed. (2d) 382; *Huron River Syndicate*, 44 B. T. A. 859.

Aside from its constitution and method of operation, moreover, the purpose for which the petitioner was organized gives further basis for our conclusion. Its function was one requiring business management and activities. It is of the sort which is ordinarily not confined within the limits of a joint venture or trust. The reasons for its establishment are more nearly those found in the case of corporations. These factors are of significance in resolving the question presently before us. The answer to be found in them supports the conclusion which we have

reached above. *Lewis & Co.* v. *Commissioner*, 301 U. S. 385; *Commissioner* v. *Vandegrift Realty & Investment Co.*, 82 Fed. (2d) 387.

The petitioner relies on *Commissioner* v. *Horseshoe Lease Syndicate*, 110 Fed. (2d) 748, and *Commissioner* v. *Rector & Davidson*, 111 Fed. (2d) 332, cases in which individuals desirous of developing oil properties owned by them sold participating interests to a rather large group and secured development by placing the management of the properties in one or two individuals, to whom they gave powers of attorney. In the latter case title was also transferred to the managers. There was in each case free assignability of interests, but no limitation on personal liability. In both instances the Board held these enterprises to resemble partnerships more nearly than corporations and to be taxable as the former. These cases were affirmed by the Circuit Court, but they can have no controlling significance here, where there is a formal agreement establishing an organization, controlled by the vote of its members, and providing for formal certificates of interest and for continuity of existence. They were mere loose arrangements, without provision for continued existence. The purposes for which they were established were, moreover, more limited than those here involved. The present case must be controlled by cases considering broader business activity undertaken by an organization having some formal arrangement. See *Solomon* v. *Commissioner*, 89 Fed. (2d) 569; *Tyrrell* v. *Commissioner*, 91 Fed. (2d) 500; *St. Louis Hills Syndicate Fund* v. *Commissioner*, 102 Fed. (2d) 1013. Cases such as these and those cited above lead, we think, to the conclusion that the petitioner more nearly resembled the corporate form and must be taxed as such.

There remains for decision the question of whether the petitioner was "carrying on" or "doing business" during the taxable years as provided in section 105 of the Revenue Act of 1935, as amended by section 401 of the Revenue Act of 1936, and section 601 of the Revenue Act of 1938. If so, the petitioner must be held liable for excess profits taxes.

The answer to this final issue is to be found in our decision on the first question. The petitioner was engaged in the active management and development of the Royal Palm Cemetery during the taxable years. It was patently "engaged in" or "doing business" in the taxable years. *Ittleson* v. *Anderson*, 67 Fed. (2d) 323; *Harmar Coal Co.* v. *Heiner*, 34 Fed. (2d) 725. Cases relied on by the petitioner wherein taxpayers were held not to be engaged in business when they had not completed their organization or begun active operations are not in point here, where it is plain that an active business enterprise was in progress during 1936. Cf. *Nicholas* v. *Colorado Fuel & Iron Corporation*, 112 Fed. (2d) 858; *General Ribbon Mills, Inc.* v. *Higgins*, 115 Fed. (2d) 472.

*Decision will be entered under Rule 50.*